IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES T. CORRIGAN, *et al.*, | ) | CASE NO. 1:03 CV 1835 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| v. | ) | |
| | ) | |
| USX CORPORATION, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | |
| Defendants. | ) | |

Plaintiffs James Corrigan and William Watterson filed suit against Defendants USX Corporation

("USX") and Kobe Steel, Ltd., ("Kobe"), alleging they were wrongfully denied retirement benefits.  In

seeking the recovery of said benefits, Plaintiffs allege they were the victims of age discrimination, age

discrimination in violation of public policy, fraud, breach of contract, promissory estoppel, and

instrumentality.  On May 20, 2005, USX and Kobe filed Motions for Summary Judgment seeking judgment

as a matter of law as to all of Plaintiffs' claims, contending summary judgment is warranted because

Plaintiffs failed to establish: (1) their employers, USS/Kobe and RTI, were mere instrumentalities of USX

and Kobe; (2) the Court has personal jurisdiction over Kobe; (3) a prima facie case of age discrimination;

(4) a prima facie case of age discrimination in violation of public policy; (5) that USX and Kobe committed

fraud and made a knowingly false misrepresentation that resulted in injury; (6) that USX and Kobe

breached the contracts which resulted in the 1989 formation of USS/Kobe and the 1999 restructuring

agreement by not crediting Plaintiffs' ten years with USS/Kobe under the retirement benefits plan; (7) that

USX and Kobe breached a binding promise that RTI would credit their ten years with USS/Kobe under

the retirement benefits plan.

For reasons fully set forth below, the Court hereby GRANTS USX's and Kobe's Motions for

Summary Judgment.

# I.  **BACKGROUND**

Plaintiffs began working as employees of USX in 1970 at Lorain Works, a steel-making facility/bar mill and pipe mill (Declaration of Robert Stanton, ¶4).  As a term of the employment, Plaintiffs were provided with a "30 and out" pension and retirement benefits plan, where in pension benefits, upon the accrual of thirty years of service, would nearly double and non-union employees would be able to retire with a full pension benefit regardless of age (Jinnyn Tata Deposition, pp. 30, 52).  When Plaintiffs had approximately nineteen years of continuous service, in May 1989, a Composite Conformed Asset Purchase and Contribution Agreement ("USS/Kobe Formation Agreement") was entered into by USX, Kobe, USS Lorain Holding Company ("USS/Lorain"), a wholly owned subsidiary of USX, and Kobe/Lorain, Inc., an indirect subsidiary of Kobe (Stanton Dec. ¶5).[1]  In accordance with the above agreement, USS/Lorain and Kobe/Lorain completed a transaction for the formation of a joint venture known as USS/Kobe Steel Company, an Ohio general partnership which would own and operate the Lorain facility and become Plaintiffs' new employer (Stanton Dec. ¶6).

The USS/Kobe Formation Agreement indicated that pension and retirement benefits for non-union employees would remain unchanged and the same retirement benefits would be offered.  (Plaintiffs' Ex. A).  Specifically, the agreement stated that non-union employees, such as Plaintiffs, who accrued benefits while

---

[1]Kobe, a Japanese corporation,  contends it does not maintain an office anywhere in the United States, including Ohio, it is not registered to conduct business in Ohio, does not have an agent for service of process in Ohio, does not derive "substantial revenue" from goods used or consumed or services rendered in Ohio, does not have an interest in any real or personal property located in Ohio, does not advertise in Ohio, has not contracted to supply goods or services in Ohio, and it has not insured any person, property or risk located in Ohio (Declaration of Yasushi Okuba, ¶¶4-10, 12).

working under USX at the Lorain facility, would continue to accrue continuous service and be credited for their USX and USS/Kobe service while employed by USS/Kobe under the United States Steel Corporation Plan for Employee Pension Benefits ("U.S. Steel Plan").  Plaintiffs, in accordance with the USS/Kobe Formation Agreement, were made participants in the USS/Kobe Steel Company Salaried Employees Pension Plan ("USS/Kobe Plan") and their service and earnings with USS/Kobe were recognized under the retirement plan of their previous employer, the U.S. Steel Plan, which was still their retirement benefit plan.  In accordance with the Agreement, USS/Kobe continued to offer the same retirement and pension plans to its non-union employees.

USX and Kobe contend USS/Kobe was a completely separate and distinct entity governed by its own Board of Directors, and maintained and managed by management personnel who were employees of USS/Kobe (Stanton Dec. ¶9).  They assert functions such as hiring, promoting, and terminating employees, negotiating labor agreements, directing work performance of employees, and making decisions regarding benefit plans and general employment matters were the sole responsibilities of USS/Kobe's management personnel (Stanton Dec. ¶10; Tata Dep., p. 10).

According to USX, USS/Kobe operated as a joint venture until 1999 when Kobe expressed an interest in dissolving the general partnership (Stanton Dec. ¶11).  Following preliminary discussions between USS/Kobe and the principal purchasers of the bar mill (and seventy percent of USS/Kobe), the Republic parties, a letter of intent was signed in April 1999 and it was announced that Republic Technologies International ("RTI") would purchase the bar mill (George Babcoke Deposition, p. 28-35, 57, 62; Tata Dep., Ex. D).  The eventual Master Restructuring Agreement was negotiated among several companies including RTI, Kobe/Lorain, USS/Kobe, Kobe, USX, and Lorain Tubular Company, L.L.C.,

and signed on August 13, 1999 (Stanton Dec. ¶12, Ex. B).

The Restructuring Agreement stated that all USS/Kobe employees in or directly associated with the bar mill operations would be transferred to RTI and all employees associated with tubular operations would remain with Lorain Tubular (Richard Mahon Deposition, pp. 44-45).  At the time of the Agreement, Plaintiffs Corrigan and Watterson were working on the bar mill side of USS/Kobe operations as a Quality Assurance Engineer in the Bar products area and a Department Manager of Bar Mill Finishing and Shipping, respectively (James Corrigan Deposition, p. 10; William Watterson Deposition, pp. 6-7; Mahon Dep., pp. 51, 53).  At this stage, Plaintiffs accrued an additional ten years of continuous service while employed by USS/Kobe, thus bringing their total time of continued service to twenty-nine years.

On August 13, 1999, the bar mill and related assets of USS/Kobe were transferred to RTI, and the pipe mill and related assets of USS/Kobe were transferred to Lorain Tubular, a joint venture equally owned by USX and a subsidiary of Kobe (Stanton Dec. ¶16, Ex. B).  Prior to the split, Babcoke, who would be joining the RTI bar mill, and Gary Gajdzik, who would be moving on with Lorain Tubular, finalized the separation of USS/Kobe's former employees and determined whether they would be transferred to RTI or Lorain Tubular (Babcoke Dep., pp. 76-77, 80, 84, 85).  It was agreed that Lorain Tubular would be permitted, but not required, to fill seven of its open positions with employees who would otherwise be transferred to RTI (Babcoke Dep., pp. 78-87, 91; Mahon Dep., pp. 33, 37, 45; Tata Dep., pp. 71-72).[2]  According to Defendants, other than these seven positions, Lorain Tubular was supposed

---

[2]According to Defendants, these positions were: (1) Department Manager Maintenance and Engineering; (2) Electrical Engineering and High Voltage Maintenance Manager; (3) Mechanical Engineering and Environmental Manager; (4) three Shift Manager of Maintenance Services positions; (5) Tubular Information Systems Manager; (6) Shift Manager #3 Seamless Finishing; and (7)

to take a "hands-off" approach with respect to the other managers because, "[a]s with any transaction of this type, the management organization of the entity being sold goes with that organization" (Babcoke Dep., pp. 84-85, 86, 89; Mahon Dep., p. 34).  Defendants allege RTI employees were notified of these open positions on August 23, 1999, and Plaintiffs and eighteen other RTI employees applied for them (Mahon Dep., p. 54; Tata Dep., p. 57).  Neither plaintiff was hired into these open positions.

The Restructuring Agreement indicated USX would continue to discharge its obligations related to employee benefits and RTI would assume the employee benefits obligations of USS/Kobe as if the USS/Kobe Formation Agreement were an agreement between USX and RTI (Plaintiffs' Ex. B).  Thus, USX was to follow through with its obligations under the USS/Kobe Formation Agreement while RTI was responsible for discharging USS/Kobe's obligations and liabilities regarding employee benefits under that agreement.[3]  According to USX and Kobe, although USS/Kobe did not know RTI's plan for changes to employee benefits, other than the fact that RTI would give employees thirty days notice before making any changes to management benefit plans, USS/Kobe's President, George Babcoke, met with management employees on June 24, 1999 to "keep management as well informed about the transaction as possible." (Tata Dep., pp. 18-20; Babcoke Dep., pp. 40-43).  During said meeting, Plaintiffs allege Babcoke "expressly represented" to non-union employees, including Plaintiffs, that they would not lose their retirement benefits, RTI service would be counted towards the "30 and out" retirement benefit, and anyone with twenty-nine years of service who was thinking of quitting should "have an IQ check."  They assert

Cashier/Admin. (Mahon Dep., Ex. 1; Tata Dep., Ex. B).

[3]Based on this agreement, upon retirement, RTI employees would receive two pension payments, one from the U.S. Steel Plan representing their USX service through 1989, and another representing their USS/Kobe and RTI service (Tata Dep., p. 105).

approximately fifty additional non-union employees will testify to Babcoke making this statement.  USX

and Kobe, however, contend that no such statements were made and Babcoke only met with employees

to inform them of the thirty-day notice policy and to provide them with a hypothetical showing what could

happen should RTI continue their benefits without change (Babcoke Dep., pp. 43, 52-53, 59-60; Tata

Dep., pp. 38-39).  Babcoke encouraged employees with twenty-nine years of service not to quit because

no changes without notice would be made and, at that stage, it was unclear what changes, if any, would

be made (Babcoke Dep., p. 65).  According to Defendants, Babcoke utilized a power-point presentation

during this meeting which supports this assertion (Babcoke Dep., p. 47).

On August 24, 1999, Vice President of Human Resources at RTI met with its employees, including

Plaintiffs, and informed them RTI was going to make several changes to the retirement plans, one of which

being the freeze of all the age, service, and earnings accrual plans as of September 30, 1999 (Watterson

Dep., Ex. F).  Thus, RTI employees would no longer be able to accumulate service towards the "30 and

out" retirement plan.  Notably, however, USX continued to offer the thirty-year pension benefit, so an

employee who had thirty years of combined service with USX, USS/Kobe and RTI , but only nineteen

years with USX would be *eligible* for a thirty-year class pension under the U.S. Steel Plan, but the *amount*

of the benefit he would receive would be based on the nineteen years of service (Tata Dep., p. 105-06,

Ex. C).  Although RTI altered its benefit plans, those changes had no effect on the U.S. Steel Plan, under

which service to RTI was treated the same as service to USS/Kobe (Tata Dep., p. 103-04, Ex. C;

Declaration of Kathleen Rusz ¶¶5, 6, 11).  Plaintiff Watterson eventually retired/resigned in September,

2000 and Plaintiff Corrigan retired in March, 2001.

Plaintiffs filed suit in state court alleging they were discriminated on the basis of their age in violation

of Ohio statutory law and Ohio public policy when they were not hired into any of the open Lorain Tubular positions that opened at the time of the Restructuring Agreement. They further allege the statements made by Babcoke regarding RTI's future benefit plans constituted fraud and a binding promise that Defendants were obligated to fulfill. Additionally, they allege Defendants breached both the USS/Kobe Formation Agreement and the Restructuring Agreement when RTI altered its benefit plans and froze all of the age, service, and earnings accrual plans. Lastly, they allege Defendants are liable for all of these wrongs, which center around the denial of the award of the total thirty-year pension benefits amount, because USS/Kobe and RTI were mere instrumentalities of USX and Kobe. The case was removed to the Court on September 30, 2003 and is currently before the Magistrate Judge for ruling on dual motions for summary judgment filed by both Defendants.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Non-moving parties cannot simply rest upon the allegations of their pleadings or general allegations in establishing that issues of fact may exist. *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974). The Supreme Court has held that, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e) requires the opposing party "go beyond the pleadings and by [his] own affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

The Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989), has interpreted *Celotex* and two related cases, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for summary judgment motions. *Street* points out the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  886 F.2d at 1479.  This burden may be met by pointing out to the court the non-movant, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.  *Id.*

In ruling on a motion for summary judgment, the Court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion.  *See Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).  The Court must also determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 249 (1986).  In reaching such a determination, however, the Court is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist.  *Id.* at 248-49.

## III.  <u>ANALYSIS</u>

### A.  Alter-ego/Instrumentality Doctrine

Plaintiffs have brought forth claims of age discrimination, fraud, breach of contract, and promissory estoppel.  The foundation of each of these claims, however, rests on Plaintiffs' ability to prove USX and Kobe are not separate and distinct from their subsidiary, USS/Kobe, and RTI.  Indeed, Plaintiffs have

admitted they were not employed by either USX or Kobe at the relevant time, but by USS/Kobe and RTI, the alleged misrepresentation at the center of their fraud and promissory estoppel claims was made by the president of USS/Kobe, Babcoke, and USX and Kobe, though parties to the contracts at issue, were not bound by the provisions of the contract in which Plaintiffs allege wrongful breach, but that USS/Kobe and RTI were.  Thus, in name at least, USS/Kobe and RTI seem to be at the center of each of their claims. The only named Defendants in this case, however, are USX and Kobe.  That being said, in order to render Defendants liable for the alleged wrongful acts of USS/Kobe and RTI, Plaintiffs must pierce the corporate veil.  Defendants have moved for summary judgment on several bases, one of which is Plaintiffs' failure to prove USS/Kobe is an instrumentality of Defendants and, as such, not a distinct entity.  Plaintiffs counter that there are genuine issues of material fact regarding whether Defendants are liable for the obligations and actions of USS/Kobe and, therefore, summary judgment should be denied.

"The protection of the corporate veil is an accepted institution and should not be pierced without compelling justification." *Kindle Building Co., v. Ford Motor Co.*, 17 F. Supp. 2d 701, 703 (N.D. Ohio 1997).[4]  Indeed, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotations omitted). The Sixth Circuit has recognized this principle and emphasized the importance of upholding distinctive corporate entities:

_____

[4]While it is plain this Court must apply state corporate law principles, because both Defendants and other relevant companies were incorporated in different states and countries, the question of choice-of-law is raised. However, both Defendants and Plaintiffs essentially admit that Ohio law provides the relevant standard for piercing the corporate veil as all parties have relied upon this state's law in arguing either for or against piercing the corporate veil.  As neither party has raised choice of law as an issue, the Court will apply Ohio law.

> [O]ur analysis begins with the premise that there is nothing illegal or immoral with the well-established legal principle that individuals can create corporate entities through which to undertake and also to limit risk of personal responsibility for their private enterprises.  This scheme encourages commerce and the expansion of trade, and it is difficult to find evil in an institution of such long standing and which finds its lawful use openly accepted and encouraged by jurisdictions throughout the world.

*See id.*, *quoting NLRB v. Fullerton Transfer and Storage Limited, Inc.*, 910 F.2d 331, 342 (6th Cir. 1990).

"'That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but like every other fiction of the law, when urged to an intent and purpose not within its reason and policy, may be disregarded.'" *Belvedere Condominium Unit Owners' Assoc., v . R.E. Roark Companies, Inc.*, 617 N.E.2d 1075, 1085 (Ohio 1993), *quoting State ex rel. Atty. Gen., v. Standard Oil Co.*, 30 N.E. 279 (Ohio 1892).  Under this exception, courts can pierce the corporate veil, that is disregard the corporate entity and treat the parent corporation and its subsidiary as a single entity.  Subsidiary liability, however, does not extend to a parent unless the subsidiary is "so dominated and controlled" by the parent "that it has no more than a paper existence." *In re Cardinal Health, Inc. ERISA Litigation*, 225 F.R.D. 552, 557 (S.D. Ohio 2005).

The burden of proof is on the party seeking to impose liability on the parent corporation for a subsidiary's actions to demonstrate that grounds for piercing the corporate veil exist. *See LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App. 1991).  In order to bring suit against a parent corporation for the activities of its subsidiary and pierce the corporate veil, a plaintiff must show the parent corporation: (1) dominated and controlled the subsidiary so that it has no mind, will or existence of its own;

-10-

(2) used that domination to commit fraud, wrong or other dishonest or unjust acts; and (3) injured the plaintiff. *See Bucyrus-Erie Co., v. Gen. Prod.*, 643 F.2d 413 , 418 (6th Cir. 1981); *see also Belvedere Condominium Unit Owners' Assoc.*, 617 N.E.2d at1086; *Kindle Building Co.*, 17 F. Supp. 2d at 703; *Elibiad v. Trans-West Express, LLC*, No. 3:03cv7452, 2005 WL 1223804, *2 (N.D. Ohio May 23, 2005). If Plaintiff satisfies these three elements, the corporate veil will be pierced and the subsidiary will be found to be the alter-ego of the parent corporation.

In determining whether a plaintiff has met the burden of establishing that the parent and subsidiary are fundamentally indistinguishable, it is of some importance to note that, generally, a parent company is not liable for the actions of its subsidiary even if the subsidiary is wholly owned by the parent corporation. *In re Cardinal Health, Inc., ERISA Litigation*, 225 F.R.D. 552, 557 (S.D. Ohio 2005); *AT&T Global Information Solutions Co., v. Union Tank Car Co.*, 29 F. Supp.2d 857, 867 (S.D. Ohio 1998); *University Circle Research Center Corp., v. Galbreath Co.*, 667 N.E.2d 445, 448-49 (Ohio Ct. App. 1995). Moreover, the exercise of the control which stock ownership gives to the stockholders, such as the election of directors, the making of by-laws, and the doing of all other acts incident to the legal status of stockholders, will not create liability beyond the assets of the subsidiary. *See Bestfoods*, 524 U.S. at 61-62. The duplication or sharing of some or all of the directors or executive offices is also not fatal to the Court treating the subsidiary as a separate and distinct entity. *See id.* at 62; *AT&T Global Information Solutions Co.,*, 29 F. Supp.2d at 867; *University Circle Research Center Corp.,* 667 N.E.2d at 448-49.

Plaintiffs contend USS/Kobe was an alter-ego of both USX and Kobe. In so alleging, they point to the fact that the subsidiaries of Defendants, USS/Lorain and Kobe/Lorain were created less than one month before the 1989 Composite Agreement forming the USS/Kobe Partnership and, as such, were

created, "solely for the purpose of acting as general partners."  They also point to the alleged testimony of the President of USS/Kobe that USS/Kobe was operated by a management committee comprised of USX and Kobe employees.  They further allege USS/Kobe's officers, "were nothing more than USX employees placed at USS/Kobe," but only offer the specific example of USS/Kobe President Babcoke in supporting this allegation.  According to Plaintiffs, the fact that Babcoke began his career at USX, moved to USS/Kobe in 1997 as Vice President of Operations and then President, then moved on to RTI following the 1999 transaction, and finally back to USX, is indicative of USX's control over USS/Kobe.  Lastly, Plaintiffs argue the dissolution of USS/Kobe was prompted by Kobe, and not its subsidiary Kobe/Lorain.

As to Plaintiffs' first alter-ego argument, that Defendants' subsidiaries, USS/Lorain and Kobe/Lorain were created "solely for the purpose of acting as general partners," Plaintiffs fail to note one rather important fact – Kobe/Lorain was not a direct subsidiary of Kobe. The record indicates Kobe/Lorain was a subsidiary of Kobe Delaware, which was a subsidiary of Kobe Steel USA Holdings, Inc., which in turn was a wholly owned subsidiary of Kobe. This renders USS/Kobe far more remote from Kobe than Plaintiffs have acknowledged – indeed, so far as Kobe is concerned, Plaintiffs' argument proves very little. The Court notes, however, the fact that Kobe was a party to the contract forming USS/Kobe lessens the significance of the existence of the above-listed Kobe subsidiaries, and evidences the fact that Kobe had a hand, however tangential, in creating USS/Kobe. As to USX's and USS/Kobe's relationship, Plaintiff's argument has the potential to  remove one step of the corporate fiction, thus bringing USX 's relationship with USS/Kobe to parent rather than grandparent status, but fails to sufficiently address how USX, even with one step removed, exerted such control over USS/Kobe that it could lawfully be considered its alter-ego.  Indeed, as stated above, the mere fact a subsidiary is wholly owned by the parent

-12-

company is insufficient to warrant the piercing of the corporate veil. *In re Cardinal Health, Inc., ERISA Litigation*, 225 F.R.D. at 557.

Plaintiffs also argue piercing the corporate veil is warranted because USS/Kobe was operated by a management committee comprised of USX and Kobe employees and USS/Kobe's officers, "were nothing more than USX employees placed at USS/Kobe." Contrary to Plaintiffs' allegations, USX has stated that USS/Kobe was governed by its own Board of Directors, which it claims was commonly referred to as the management committee, and was separate and distinct from its general partners and their parents. It further contends the day-to-day management of USS/Kobe was the responsibility of USS/Kobe employees. In support of their allegations, Plaintiffs rely on the testimony of USS/Kobe's president, who testified the management committee was comprised of three "U.S. Steel" employees and three Japanese employees, though he was unsure as to whether they were employed by Kobe (Babcoke Dep., p. 13). Babcoke also testified, however, that USS/Kobe's management committee did not handle the day-to-day operations of the company and its only participation with USS/Kobe took place during three meetings each year (Tr. 22). Moreover, the Supreme Court has held the duplication or sharing of some or all of the directors or executive offices is also not fatal to the Court treating the subsidiary as a separate and distinct entity, thus rendering Plaintiff's allegations regarding the management committee and President of USS/Kobe less than conclusive. *See Bestfoods*, 524 U.S. at 62; *AT&T Global Information Solutions Co.,* 29 F. Supp.2d at 867; *University Circle Research Center Corp.,* 667 N.E.2d at 448-49. Additionally, Plaintiffs have offered nothing in support of their allegations the management committee was also comprised of Kobe employees. As it is Plaintiffs' burden to establish grounds for piercing the corporate veil, their failure to provide such evidence regarding Kobe renders their allegations, in this

respect, meritless.

Lastly, Plaintiffs allege that the dissolution of USS/Kobe was prompted by Kobe, and not its subsidiary Kobe/Lorain, Inc. Kobe has failed to address this argument and it appears the Stanton Declaration does contain the above language.  An active role in the dissolution of a subsidiary is consistent with control.  However, other than this one incident, Plaintiffs have failed to offer any other evidence suggestive of Kobe's control over USS/Kobe.  One incident alone is insufficient to establish the level of control required to prove USS/Kobe and Defendants were fundamentally indistinguishable and that USS/Kobe led a mere paper existence.

Regarding USX, Plaintiffs have alleged USS/Lorain was created for the sole purpose of forming the USS/Kobe partnership, which sufficiently altered the relationship between USX and USS/Kobe from grandparent/subsidiary to parent/subsidiary, but failed to show that the parent/subsidiary corporate fiction should be disregarded as well.  They have alleged members of USS/Kobe's management committee were employees of USX and offered Babcoke's testimony that the management committee was comprised of "U.S. Steel" employees in support of that allegation, but have failed to offer any evidence that the management committee exercised a level of control which was contrary to Babcoke's additional testimony that the day-to-day operations of USS/Kobe were not conducted by the management committee. They also did not provide any case law suggesting the Court should not follow the U.S. Supreme Court's ruling that the duplication or sharing of some or all of the directors or executive offices is not fatal to the Court treating the subsidiary as a separate and distinct entity.  Well-settled law drives this Court to find that these allegations and what little evidence that has been provided to support them are insufficient to prove USS/Kobe was a mere alter-ego of USX.  Upon reviewing the USS/Kobe Formation Agreement, the

Court recognizes USX undertook many binding obligations under said contract, but the source of said obligations were derived from its role as seller of the Lorain facility rather than as a "controller" of USS/Kobe.

As to Kobe, Plaintiffs have alleged Kobe/Lorain was also created for the sole purpose of forming the USS/Kobe partnership, but did not explain how removal of that one corporate fiction was in any way indicative of USS/Kobe being a mere alter-ego of Kobe.  Disregarding the corporate fiction of a single subsidiary is hardly conclusive of Kobe dominating and controlling USS/Kobe to the point where it had no mind, will or existence of its own when there are two other subsidiaries separating them.  Plaintiffs also claim members of USS/Kobe's management committee were employees of Kobe but, as with USX, failed to provide the names of the members at issue and any evidence supporting their allegations of said members' employment status.  The only evidence Plaintiffs provide that was indicative of control over USS/Kobe was the statement in the Stanton Declaration which, alone, is insufficient to prove the level of control required to warrant piercing the corporate veil. The Court notes, however, that Kobe was a party to the USS/Kobe Formation Agreement and, in that role, retained several contractual rights.  Indeed, Kobe was entitled to: (1) inspect and evaluate the Lorain facility prior to closing (§5.2); (2) receive notice from USX of any impairment and the estimated cost of repairing any affected asset which was supposed to be transferred (§5.7(a)(i)); (3) receive the results of a survey of the real property that was the Lorain facility (§6.1(j)); and (4) receive indemnification costs from USX and its subsidiary in certain circumstances (§7.1). Although Kobe has a more significant role in the Agreement than even Plaintiffs have alleged, and this role supports Plaintiffs allegations that the separation of Kobe and USS/Kobe is not as remote as it may seem, the Court finds the contract is not indicative of Kobe's fundamental control over USS/Kobe.  These rights,

-15-

as set forth above, concern Kobe's role in the formation of USS/Kobe before it existed, but fail to address Kobe's level of control after its came into existence, so to speak, and at the relevant times.  There is also no indication as to whether Kobe, in fact, exercised these rights.  Consideration of the questions raised by the USS/Kobe Formation Agreement make the alter-ego determination regarding Kobe much more difficult than that for USX, but is still insufficient to establish Kobe dominated and controlled USS/Kobe so that it had no mind, will or existence of its own.  Indeed, the subject of these contract provisions fail to even touch on the aspects of the USS/Kobe partnership that would signify notable control.  As such, the Court concludes Plaintiffs have failed to raise facts which, if believed, would support the conclusion USS/Kobe was the alter-ego of Kobe.

Needless to say, the void of evidence showing USS/Kobe and Defendants were fundamentally indistinguishable is even more extensive regarding the relationship between Defendants and RTI.  Indeed, Plaintiffs quite wisely attempt to avoid this task by alleging that because USS/Kobe *assigned* its payment of benefits obligation to RTI, and RTI failed to comply, USS/Kobe, as assignor, was obligated to pay RTI's contractual obligations to third parties, namely Plaintiffs.  As the Court has already concluded USS/Kobe was not the alter-ego of Defendants, this argument is rendered moot.[5]

In deference to the above analysis, the Court finds it unnecessary to delve into a discussion regarding the fraud/injustice prong of the alter-ego test.  Plaintiffs' failure to satisfy the first element of the

---

[5]Plaintiffs claim they were discriminated against when they were not hired into the open positions in Lorain Tubular.  This would suggest that an alter-ego analysis regarding Lorain Tubular, which was a partly-owned, and eventual a wholly-owned subsidiary of USX, would be necessary.  Plaintiffs, however, have offered no evidence regarding the relationship between USX and Lorain Tubular, nor have they even offered the allegation of such.

test renders their satisfaction, or lack thereof, of the second prong pointless.  However, the Court will give consideration to Plaintiff's allegations that they have met what they have classified as the federal standard of alter-ego/instrumentality claims.  According to Plaintiffs, this standard developed out of ERISA litigation for the purpose of protecting the contractual benefits of employees and "afford[ing] Federal Courts broad authority to disregard the corporate fiction."  Plaintiff has explained this standard allows the Court to pierce the corporate veil to prevent a corporate business from limiting its pension fund responsibilities by fractionalizing business operations or avoiding its obligation under a collective bargaining agreement through a "sham transfer of assets."   Relying on cases arising out of the Seventh Circuit, Plaintiffs have explained that the federal standard requires only that the Court consider the amount of respect which shareholders give the separate entity, the fraudulent intent involved and the amount of injustice the parties would suffer by respecting the corporate entity.

The Court agrees with Plaintiffs in so much as they argue the Seventh Circuit has recognized a differing standard for piercing the corporate veil when an ERISA violation is at issue.  However, the Court is unconvinced that such a standard is applicable in the current case.  Indeed, the cases cited by Plaintiff and the opinions relied upon by said cases have made it clear that their application of the more relaxed alter-ego standard is appropriate only when ERISA or another federal statute is at the center of the litigation.  For instance, *Lumpkin v. Envirodyne Indus., Inc.*, reasoned that the more relaxed standard was appropriate because,

> [T]he protection afforded by the corporate form might be undercut by the overriding *federal legislative policy reflected in the particular statute* providing an aggrieved party with a cause of action.

> The underlying congressional policy behind ERISA clearly favors the

-17-

disregard of the corporate entity in cases where employees are denied their pension benefits. ... [T]he *congressional intent of ERISA* is to hold employers responsible for pension benefits, so that when the corporate form poses a bar to liability, *"concerns for corporate separateness are secondary to what we view as the mandate of ERISA."*

933 F.2d 449, 460 (7th Cir. 1991), *quoting and citing Pension Ben. Guaranty Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1[th] Cir. 1983) (emphasis added).  Similarly, in *Chicago District Council of Carpenters Pension Fund v. Sunshine Carpet Services, Inc.*, the Court stated, "there is *a federal interest* in ignoring the corporate form to impose liability in cases concerning pension benefits governed by ERISA."  866 F. Supp. 1113, 1116 (N.D. Ill. 1994) (emphasis added).  The First Circuit case which is regularly cited by the Seventh Circuit cases relied upon by Plaintiffs, *Alman v. Danin*, contains reasoning which logically and quite specifically limits the scope of the relaxed federal standard to cases involving federal law:

> The Supreme Court has, however, provided some guidance, stating that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.  *The Court has further indicated that corporate form may not defeat overriding federal legislative policies.*  This Court has said, [t]he general rule adopted in the federal cases is that a corporate entity may be disregarded in the interests of public convenience, fairness and equity.  *In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine ... .*

> ERISA, the statute sought to be enforced here, cannot be said to attach great weight to corporate form. ... Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, *would seem to be precisely the type of conduct Congress wanted to prevent*.

-18-

801 F.2d 1, 3-4 (1ˢᵗ Cir. 1986) (internal citations and quotations omitted) (emphasis added).

The above cases, in relying on the legislative intent of Congress and the underlying purpose of ERISA, render the nature of ERISA, as a federal statute, significant in utilizing a more relaxed alter-ego standard. Although pension benefits are very much at issue in the present case, none of the Plaintiffs' claims were brought under federal law, much less ERISA. As such, the federal alter-ego standard Plaintiffs wish the Court to utilize is wholly inappropriate based on the reasoning set forth in the very cases they wish the Court to follow. The Court will, therefore, apply the alter-ego test as set forth under Ohio law.

### B. Personal Jurisdiction Over Kobe

The Court may only exercise personal jurisdiction over a non-resident defendant, such as Kobe, if there are sufficient minimum contacts between said defendant and the forum state. Deciding the issue of personal jurisdiction is a two part inquiry, beginning first with the determination as to whether the defendant is encompassed by the forum's long-arm statute, and second with whether allowing the defendant to be sued in the forum state would satisfy constitutional due process standards. *Advanced Polymer Sciences, Inc. v. Phillips Industrial Services*, 34 F. Supp.2d 597, 599 (N.D. Ohio 1999). Ohio's long-arm statute states in pertinent part, "a court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's ... [t]ransacting any business in this state." Ohio Rev. Code §2307.382(A)(1). However, to comport with due process, exercise of personal jurisdiction requires that Plaintiffs also have certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Walker v. Concoby*, 79 F. Supp. 2d 827, 832 (N.D. Ohio 1999). Neither party disputes Plaintiffs' satisfaction of Ohio's long-arm statute, but they do differ on whether the due process element has been met. According to Kobe, the required minimum

contacts do not exist and, consequently, it is entitled to judgment in this matter as Plaintiffs have failed to establish the Court has personal jurisdiction over it.  The Court, however, disagrees.

The Court acknowledges Kobe cannot be subject to a judgment from this Court unless Plaintiffs establish that it had sufficient minimum contacts with the State of Ohio.  *See id.*  This minimum contacts requirement, *i.e.*, analyzing the due process limits of personal jurisdiction, can be met in two ways, through general or specific jurisdiction.  "General jurisdiction is proper only where 'a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.'"  *Bird v. Parsons*, 289 F.3d 865, 873 (6th Cir. 2002), *quoting Third National Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989) (internal quotations omitted).  If general jurisdiction is not established, Plaintiffs must demonstrate Kobe's contacts with the forum state are related to the case at hand.  *See Southern Machine Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968).

### 1.  General Jurisdiction

Kobe, quite predictably, contends Plaintiffs have failed to prove it has continuous and systematic contacts with the State of Ohio to warrant the Court exercising general jurisdiction over it.  Plaintiffs, on the other hand, argue Kobe does have sufficient contacts with Ohio, and rely upon an article published on Kobe's website regarding its "ten year 'joint venture' with USX in Lorain, Ohio."  Although they failed to provide the Court with a copy of said article, they provide some of the text, which states, "USS/KOBE Seel Company was formed in July 1989 as a 50/50 joint venture between Kobe Steel and USX.  USS/KOBE carried out a large modernization program and benefitted from technical support from Kobe Steel."  According to Plaintiffs, the article also indicates, "that on August 13, 1999, Kobe and USX entered

-20-

into an agreement with the Republic Groups 'to combine the steelmaking and bar producing assets of USS/Kobe Steel Company at Lorain, Ohio with companies controlled by Blackstone ... USS/KOBE was originally an equal partnership joint venture between Kobe Steel and USX." Kobe counters Plaintiffs' arguments regarding the article merely by stating, "[t]he existence of an article that oversimplified this transaction does not negate the clearly established facts of this case. Therefore, even if the article were in evidence, its content would be immaterial to whether Kobe Steel actually had systematic and continuous contacts in Ohio." The Court is not entirely convinced it should disregard the article merely because Kobe indicated it was "oversimplified" and "immaterial" as the Court believes the article is more "inconvenient," if anything. However, the article alone is insufficient to prove it had "continuous and systematic contacts" with the State of Ohio.

Kobe contends it is a Japanese corporation with its principal place of business located in Kobe, Japan, it does not have any offices or real property located in Ohio or in all of the United States, it is not registered to do business in Ohio, and it has not appointed an agent for service of process in Ohio. It also asserts it did not contract to supply goods or services in Ohio or advertise its goods or services in Ohio. Plaintiffs, however, argue Kobe was a named party to the 1989 agreement, and to three other agreements linked to the USS/Kobe Formation Agreement (confirmation agreement, unconditional guarantee of performance agreement, trademark licensing agreement), as well as to the Restructuring Agreement, which indicates a ten year connection to the State of Ohio.

Although the Court agrees that Kobe's inclusion in the contracts listed above indicate some contact with the State of Ohio, it cannot agree with Plaintiffs' claim that said contact was both continuous and systematic. *See Walker*, 79 F. Supp. 2d at 832 (although both defendants visited the forum state on one

-21-

occasion and engaged in two business transactions in the forum which resulted in an ongoing obligation to author and distribute a product, such behavior is not the kind of continuous and systematic contact that would allow claims against a defendant that are not based on their contacts with the forum). The contracts at issue, though apparently numerous, were essentially derived from two transactions within the State of Ohio. Moreover, Kobe's part in the contracts themselves were somewhat inconsequential and tangential, especially when compared to the true purpose of the transactions at issue, which dealt with the formation of a general partnership and the eventual sale of the assets resulting from that partnership. That being said, the Court concludes that Plaintiffs have failed to establish that general jurisdiction is proper.

## 2. Specific Jurisdiction

Specific jurisdiction arises if a defendant has sufficient minimum contacts with the forum state and the action arises out of those contacts. To establish the existence of specific jurisdiction, Plaintiffs must prove: (1) Kobe purposefully availed itself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action arose from or was related to Kobe's actions in the forum state; and (3) Kobe's acts or the consequences caused by Kobe have a substantial enough connection with the forum state to make the exercise of jurisdiction over Kobe reasonable. *Id*. at 832-33.

Kobe argues it did not purposely avail itself of the privilege of acting in Ohio, pointing to certain case law which held ownership of a corporation/subsidiary located in the forum state does not constitute purposeful availment. Though the Court does not question the existence of said case law, it notes Kobe has failed to address Plaintiffs' contention that their participation in the USS/Kobe Formation Agreement, three other contracts linked to that agreement, and the Restructuring Agreement, satisfies this element of the test. All of the above contracts concern a facility located in Lorain, Ohio, and assign Kobe some rights

and responsibilities that require it take action within the State of Ohio.  Moreover, said contracts contain a choice-of-law provision which provide Ohio law is controlling, which is also indicative of Kobe availing itself of the privilege of acting in Ohio.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) (in determining whether a defendant purposefully availed itself of the privilege of doing business in the forum state, a court may take into consideration an included choice-of-law provision).  The Court concludes these contracts are sufficient to establish Kobe purposefully availed itself of the privilege of doing business in Ohio.

Defendant next contends specific jurisdiction does not exist because Plaintiffs have failed to prove their cause of action arose from or were related to Kobe's actions in Ohio.  Specifically, it argues that the cause of action at issue arose solely from the acts of its subsidiaries and there is no evidence indicating Kobe conducted any activity in Ohio that is substantially related to Plaintiffs' cause of action.  It also argues, somewhat contradictorily, that Plaintiffs cannot satisfy this element because they were not parties to the USS/Kobe Formation Agreement or the Restructuring Agreement (to both of which Kobe was a party) and, therefore, have no standing to bring the breach of contract claim at the center of their action.  Plaintiffs, on the other hand, contend that because their claims arose out of the these contracts, they have successfully established their claims arose out of Kobe's Ohio activities.

Based on the Court's earlier analysis regarding the alter-ego doctrine, a finding on this issue is rendered somewhat complicated.  Kobe was clearly a party to the contracts that are at the center of the litigation but the Court has already concluded Kobe did not use Plaintiffs employers, the entities that actually committed the alleged wrongdoings, as an instrumentality.  Thus, Kobe had a somewhat tangential and peripheral role in the events leading to this lawsuit.  The burden for meeting this element, however,

does not appear to be very high. *See Walker*, 79 F. Supp. 2d. at. 833.  Kobe was a party to the contracts at the center of the litigation, it owned the subsidiary which was half of the USS/Kobe general partnership, and it encouraged the dissolution of USS/Kobe which resulted in the change of Plaintiffs' employer to RTI. Taking these factors into consideration, the Court finds Plaintiffs' cause of action, if not arising from, unequivocally was related to Kobe's actions within the forum state.

Lastly, the Court must address the reasonableness of exercising jurisdiction over Kobe. Regarding this element, the Court must consider the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of the controversies. *Advanced Polymer Sciences, Inc.*, 34 F. Supp. 2d at 602.  The burden, however, rests with Kobe to show exercising jurisdiction over it would be unreasonable. *See Burger King Corp.*, 471 U.S. at 477.  Kobe has not bothered to even attempt to meet this burden.  The Court, however, has given consideration to the above-listed factors and concluded exercising jurisdiction over Kobe would be reasonable.  Kobe is currently embroiled in other litigation within this district, was a party in other litigation in 2000 in this Court, and has performed adequately throughout this current litigation.  It has obtained counsel located within the State and the Court cannot find any indication, nor has Kobe provided any evidence, that defending a lawsuit in an Ohio courtroom is overly burdensome.  Moreover, Ohio clearly has an interest in this litigation as it concerns contracts for personal and real property, employees, a general partnership, activities and alleged wrongdoings located and performed within its borders.  Indeed, this Court believes it is the only forum that would be appropriate to hear this matter.  That being said, the Court concludes Plaintiffs have sufficiently established specific jurisdiction and the Court may freely exercise jurisdiction over Kobe.

**IV.  <u>CONCLUSION</u>**

For the foregoing reasons, the Court finds that it may exercise jurisdiction over Defendant Kobe

Steel, Ltd., and that Plaintiffs Corrigan and Watterson's failure to successfully pierce the corporate veil

demands that their case against Defendants Kobe Steel, Ltd., and USX Corporation be dismissed and the

Court GRANTS their dual Motions for Summary Judgment.

s/ Kenneth S. McHargh        
Kenneth S. McHargh
United States Magistrate Judge

Date:  October 14, 2005